UNITED STATES of America

v.

**Sharvonne McKINNON**

**Nos. 91–299–CR–T–17B, 97–2815–Civ–T–17B.**

United States District Court, M.D. Florida, Tampa Division.

Nov. 23, 1998.

Darlene Calzon Barror, Law Office of Darlene C. Barror, Tampa, FL, for Defendant.

Jeffrey Downing, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, for U.S.

### ORDER

KOVACHEVICH, Chief Judge.

This cause is before the Court on Defendant McKinnon's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 and Motion for the Modification of an Imposed Term of Imprisonment Pursuant to 18 U.S.C. § 3582(c)(2) (Docket No. 414) and the Government's Answer in Opposition thereto (Docket No. 416). An evidentiary hearing was held and Defendant submitted Defendant's Closing Statement in Evidentiary Hearing Held on March 31, 1998 for Motion under 28 U.S.C. § 2255 (Docket No. 431) and the United States filed Respondent United States' Memorandum in Opposition to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, Pursuant to 28 U.S.C. § 2255 (Docket No. 432).

On May 7, 1993, Defendant was found guilty, by a jury, of one (1) count of conspiracy to distribute crack cocaine, in violation of 21 U.S.C. § 846. On July 21, 1993, Defendant was sentenced to life imprisonment. Defendant subsequently appealed her conviction which was affirmed on January 6, 1997. On September 18, 1997, Defendant moved for sentence modification pursuant to 18 U.S.C. § 3582(c)(2) and sentencing guideline amendments 505, 509, and 519. On October 24, 1997, the Court held a hearing on the Government's Rule 35 motion. At the hearing, Defendant's present counsel, Darlene Calzon Barror, made representations to the Court which indicated that a motion to vacate sentence under § 2255 was more appropriate than proceeding on the Government's Rule 35 motion. Based on these representations, the Court continued the Rule 35 hearing, deferred ruling on Defendant's § 3582 motion, and allowed the Defendant thirty (30) days in which to file her § 2255.

In Defendant's § 2255 motion, she contends that she did not receive her constitutionally guaranteed right to effective assistance of counsel. Defendant asserts that her trial counsel exhibited "an inordinate concern for the outcome in the case and fate of the other co-defendants, to the detriment of [Defendant]." In addition, Defendant argues that her trial counsel did not adequately inform her of the true nature of the Government's plea offer and, as a result, Defendant elected to go to trial rather than accept the Government's offer. Defendant's trial counsel has written a letter to Defendant supposedly admitting that his representation was defective.

On February 24, 1998, this Court entered an Order explaining that an evidentiary hearing was necessary to resolve the issues raised by Defendant's § 2255 Motion (Docket No. 417). An evidentiary hearing was held on March 31, 1998, and the letter written to Defendant by her trial counsel was explored in depth. After the evidentiary hearing, the parties were directed to prepare written argument based on the testimony elicited at trial.

Defendant claims that her trial counsel, Frank Johnson, rendered ineffective assistance of counsel for two (2) reasons: (1) Defendant alleges that she wanted to testify at trial and Mr. Johnson improperly advised her not to testify because of an inappropriate concern for the fate of the codefendants, rather than, in the best interests of Defendant; and (2) Defendant alleges that Mr. Johnson failed to advise her of a "seven-year plea offer" and that she would have accepted

the offer if it had been communicated to her by counsel.

## I. Ineffective Assistance of Counsel

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Defendant's claim that her representation was so defective as to require reversal of her conviction must satisfy the two part test announced in *Strickland.* In order to prevail, Defendant must not only show that her trial counsel's performance was deficient, but also that she was prejudiced by that performance. *Id.*

### A. Conflict of Interest

Defendant argues that her trial counsel has admitted in a letter sent to her that he exhibited an inordinate concern for the outcome in the case and the fate of the other co-defendants, to the detriment of his client. The letter, dated January 28, 1997, provides:

> I was overly concerned about the effect of your testimony at the trial on the other defendants.
>
> You could have given the jury a different view of the critical issues that seemed to tie you into the conspiracy. You may have been able to give the jury a reason to have acquitted you based on your testimony. Further, there was no tactical advantage to be gained by your refusal to testify. You had no prior record. Additionally, testifying at the trial would only have helped your case. There was no way for you to have been harmed by testifying.

(Pet.Ex.1).

Defendant asserts that she was wrongfully advised not to take the stand in her own defense, and that Mr. Johnson's letter confirms that such a decision was of no tactical advantage to Defendant. Defendant relies almost exclusively on the January 28, 1998, letter from her trial counsel.

Conversely, the Government argues that the Court must give great deference to the choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy. *See Devier v. Zant,* 3 F.3d 1445, 1450 (11th Cir.1993). Moreover, the Government asserts that strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. The Government maintains that "[s]ound tactical decisions within the range of reasonable professional competence are not vulnerable to attack." Moreover, the Government argues that every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *See Weeks v. Jones,* 26 F.3d 1030, 1036 (11th Cir.1994).

During the March 31, 1998, evidentiary hearing, Mr. Johnson was questioned about his tactical decision to advise Defendant not to testify. Mr. Johnson testified that at the time the Government had rested its case, no firm decision was made as to whether Defendant was going to testify. (T-47). Mr. Johnson testified that he discussed with Defendant the pros and cons associated with Defendant taking the stand. According to Mr. Johnson, he based his advice on his perception of the evidence presented, the positive aspects of Defendant's testimony and the negative aspects of her testifying. (T-48). Mr. Johnson testified that he has practiced law for 18 years and has tried a couple of hundred jury trials, and, based on his experience, he advised Defendant not to testify. (T-48). "Actually, she agreed with my advice not to testify. And quite frankly, I gave her advice and told her that she would have to make the decision as to whether to testify or not to testify based on what I told her." (T-49). Moreover, Mr. Johnson testified that, based on his participation in the discovery process, his investigation and work in preparing the case for trial, and his involvement in the trial and listening to the Government witnesses and cross-examining them, it was the best tactical decision at that time for Defendant not to testify. (T-49).

Mr. Johnson's January 28, 1997, letter, which is contrary to his testimony was ex-

plained at the evidentiary hearing by Mr. Johnson. Mr. Johnson testified:

> It is my opinion that at the time the decision mas made for Miss McKinnon—at the time the advice was given to her, that I didn't think she should testify. And her decision was made—that advice and that decision both were made during the heat of a contested trial proceeding. At a time when I, in fact, had my records in front of me, my notes in front of me, reviewed the testimony, the weaknesses and strengths of the testimony, and came to a conclusion with regard to what advice I should give her, gave her that advice and she responded with a decision.

> This letter was written, I guess, in the cool of the day, after the trial hurdle was not passed, and after the appeal court reversed—refused to issue a favorable decision to Miss McKinnon. So the circumstances were different between the time of the initial advice and the time of the subsequent letter.

(T50–51).

Essentially, Mr. Johnson testified that, after looking at what had happened in hindsight, "maybe" he could have given Defendant different advice. (T–51). When asked why he had written the letter to Defendant, Mr. Johnson responded that he had been replaying the trial in his head, trying to figure out what, if anything, could have been done to achieve a different result. (T–54). Mr. Johnson emphasized that the letter was based solely on looking back after three and a half years. (T–58).

Mr. Johnson testified that his advice to Defendant not to testify was based on the fact that Defendant was present at a meeting which tied Defendant to the conspiracy, that there was an audio tape where Defendant and others warned persons who were allegedly involved in the conspiracy, and that Defendant was present at Mr. Mathis' house, during the time when one of the witnesses and Mr. Mathis were either counting money or counting parcels of crack cocaine.[1] (T–20–21). Mr. Johnson testified that the only reason he thinks, in hindsight, that Defen-

dant should have testified is because she "may" have been able to receive sympathy from the jury and "possibly," the jury could have "pardoned" her. (T–21; 23; 24). "Jurors have the power to, even if the evidence is against a defendant, it's not so much done in federal court, but jurors, if they chose to, can still render a verdict that amounts to a jury pardon. The—that's the possibility in any case ... jury's can do anything they chose to do." (T–24). However, Mr. Johnson testified that there was no objective evidence that Defendant's testimony could have provided that could have dispelled the evidence against her. (T–22–23).

Nevertheless, Defendant argues that the reason Mr. Johnson advised her not to testify was based on an inappropriate concern for the negative impact that her testimony would have had on the codefendants, rather than, to successfully defend Defendant.

■ In order to establish a violation of her Sixth Amendment right to the effective assistance of counsel due to a conflict of interest, Defendant must demonstrate that an actual conflict of interest adversely affected her lawyer's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Porter v. Singletary,* 14 F.3d 554, 560 (11th Cir.1994).

"Anything less than an actual conflict 'is insufficient to impugn a criminal conviction.'" *Porter,* at 560. (quoting *Cuyler* at 350, 100 S.Ct. 1708). A speculative or hypothetical conflict is insufficient. *Id.; Burden v. Zant,* 24 F.3d 1298, 1305 (11th Cir.1994). "Instead, [Defendant] must be able to point to specific instances in the record which suggest an impairment or compromise of [her] interests for the benefit of another party." *Id.* Defendant has to make a factual showing of inconsistent interests and demonstrate that Mr. Johnson made a choice between advising Defendant to testify or not testify and that it was helpful to the codefendants but harmful to Defendant. *See Id.* at 561.

■ The only evidence Defendant can point to is Mr. Johnson's letter which was

---

1. Mr. Mathis was the leader of the conspiracy and primary target of the law enforcement's investigations. Defendant and Mr. Mathis also lived together for some time and were dating.

written three and a half years after the trial. During the evidentiary hearing, Mr. Johnson unequivocally testified that he did not have any concerns about how his advice to Defendant not to testify would have affected the codefendants at trial. (T–68–70). Although Defendant testified that Mr. Johnson advised her that she should not testify because it would do more harm to the codefendants than it would do good, Defendant has failed to satisfy her burden. Mr. Johnson's advice appears to have been a sound tactical decision. *See* (T–25) (Mr. Johnson explaining that there were a whole host of other issues that the Government could have solicited on cross-examination that might have demonstrated her knowledge of certain other incidents that were not worth risking by putting Defendant on the stand).

The Government maintains that there was substantial evidence presented at trial that demonstrated that Defendant was an active participant in the conspiracy. The Government explains that it offered numerous audio tapes which clearly demonstrated Defendant's involvement. The Government argues that had Defendant testified at trial, she certainly would have been cross-examined about the audio tapes as she was when she testified untruthfully at her sentencing hearing. The Government argues that Defendant's testimony would have been considerably detrimental to Defendant; therefore, her trial counsel's advice appears to have been excellent advice.

With regards to Mr. Johnson's statement in the January 1997, letter about undue concern for the codefendants, Mr. Johnson testified that, "my primary purpose in this entire case was to be as aggressive as I could and to be as thorough as I could and at the same time not allow Miss McKinnon to do anything that would have made the jury's decision any easier." (T–25). Mr. Johnson merely testified that, looking back, and being very frustrated at the outcome of the trial and the appeal, he "perhaps" should have given Defendant a greater reason to testify in order to get a sympathy pardon from the jury. (T–27–28). Defendant has failed to demonstrate an actual conflict.

**B. Failure to Advise Defendant of Plea Offer**

Defendant also claims that she was never made aware of the fact that the ten (10) year plea offer was characterized by the Government as resulting in a seven (7) year period of incarceration, due to the reduction resulting from the Government's filing of a § 5K1.1 motion for the standard cooperation and assistance required. Defendant contends that she understood the plea offer to require a ten (10) year period of incarceration which was not acceptable. Defendant argues that by not explaining the resulting offer and its ramifications, Mr. Johnson never communicated to the Defendant the true nature of the offer, and that the seven (7) years would have been an acceptable agreement.

The Government contends that there is no evidence that Defendant ever wanted to accept any plea offer made by the Government. The Government maintains that every indication from Defendant and her attorney was that she was not willing to plead guilty under any circumstances. In fact, Mr. Johnson testified that Defendant's position was that she was not guilty of the charges in the indictment. (T–46). The Government asserts that Defendant indicated that she wanted to go to trial and that she rejected all plea offers made by the Government. The Government asserts that Defendant never indicated that an offer would be acceptable if it meant that she would have to go to prison.

Moreover, the Government argues that it was involved in numerous plea discussions with Defendant's trial counsel. The Government asserts that all of the plea discussions involved Defendant pleading guilty to count one (1) of the indictment which carried a base offense level of 42. The Government states that based on the use of firearms in the offense, a two (2) level upward adjustment would have been appropriate, which would have resulted in an offense level of 44.

The Government admits that it had agreed to recommend a two (2) level downward departure for acceptance of responsibility, which if accepted by the Court, would have resulted in a total offense level of 42. Nevertheless, the Government contends that Defendant still would have had a sentencing

guideline range of 360 months to life imprisonment. Moreover, the Government explains that the recommended sentences were ultimately subject to an evaluation of the value of the assistance provided by the Defendant, and, subsequently, a determination by the Court if a motion to reduce sentence were filed.

The Government asserts that no specific term of sentence was to be set out in the agreement, nor was it an offer to plead to a specified period of incarceration. The Government maintains that it asked Mr. Johnson whether Defendant would plead and cooperate if the Government ultimately could recommend a sentence of approximately ten (10) years. After being informed that that result was unacceptable, the Government asserts that it subsequently, asked Mr. Johnson whether a sentence somewhere near seven (7) years would be satisfactory. The Government states that Mr. Johnson subsequently informed counsel for the Government that he had a lengthy discussion with Defendant regarding the "seven year offer" and that she would not plead guilty if it meant going to prison.

During the evidentiary hearing, Mr. Johnson was asked about the plea negotiations between himself and the Government concerning Defendant. Mr. Johnson testified to the following:

This is what I recall about this offer business. There came a time when all defense counsel were invited to appear at the St. Petersburg Police Department specifically for the purpose of looking at the volume of evidence the government and police had collected with regard to the case. I recall that either—subsequent to that point that an offer of ten years was made to Miss McKinnon. That offer was communicated to Miss McKinnon. The offer was rejected by Miss McKinnon.

Throughout the course of the trial, it was my habit to speak with Mr. Downing on a regular basis about trying to obtain a more favorable offer for Miss McKinnon that did not involve jail time. No such offer was ever made by Mr. Downing.

Now, with regard to this notion of seven years, no offer of seven years was ever communicated to me by Mr. Downing or Miss Peluso, the government's representatives during this trial. And in fact, all offers that were communicated to me were given to my client for her to accept or reject. But no seven-year offer was ever made. No offer was ever made in this case that did not involve Miss McKinnon going to prison.

Furthermore, throughout the course of this entire trial, Miss McKinnon maintained that she was not guilty, that she had nothing to trade to the government with regard to becoming a witness in this case.

(T–29–30).

Mr. Johnson unequivocally testified there was never an offer made of seven years. (T–30–31). Moreover, the Assistant United States Attorney, Jeff Downing, testified that in May or June, 1992, he discussed a plea offer with Mr. Johnson, which was the same offer made to every other defendant, except for Ronald Mathis.[2] (T–184). Mr. Downing testified that he discussed three (3) different options with Mr. Johnson concerning Defendant: (1) go to trial and if convicted, receive life imprisonment; (2) plead guilty without cooperating, which would have likely translated into a sentencing range of 30 years to life; and (3) plead guilty and cooperate, and the ultimate outcome would depend on the amount of cooperation provided. (T–186–87).

Mr. Downing testified that when Mr. Johnson subsequently asked what the lowest sentence Defendant could receive if she cooperated, Mr. Downing replied that he would have to hear what Defendant had to say before he could make a determination. (T–187). Mr. Downing testified that Mr. Johnson informed him that Defendant was not interested in any agreement if it involved jail time and that Mr. Johnson was informed that this was not even a possibility. (T–187–88).

Mr. Downing testified that subsequently, as the trial grew closer, he contacted Mr. Johnson to discuss "more firmer numbers" with regards to a potential sentence for De-

---

**2.** The Government points out that the offer made to all defendants was accepted by twenty-four (24) of them and guilty pleas were entered pursuant to plea agreements.

fendant if she were to cooperate. (T–189). Mr. Downing testified that he questioned Mr. Johnson about Defendant's unwillingness to cooperate, especially when she was facing a life sentence by going to trial. (T–190). According to Mr. Downing, Mr. Johnson explained again that Defendant did not want to go to jail, and, that she was concerned about the defendants she would have to testify against. (T– 190–91).

After being informed again that avoiding jail was not an option for Defendant, Mr. Johnson asked Mr. Downing what was the lowest sentence Defendant could possibly receive. (T–191). Mr. Downing told Mr. Johnson that, in a best case scenario, there was a possibility that the Government could recommend a sentence of ten (10) years. (T–192). However, Mr. Downing considered this as part of the plea discussions and not a plea offer. (T–192). Notwithstanding, Mr. Johnson subsequently informed Mr. Downing that Defendant was not interested in "the ten-year deal" or any other sentence that involved prison. (T–193–94). Mr. Downing testified that when Mr. Johnson once again indicated that Defendant did not want to go to jail, he was interested in whether Defendant would budge from that position, and Mr. Downing asked Mr. Johnson, "what if we could get the sentence down to about seven years." (T–194). Subsequently, Mr. Johnson informed Mr. Downing that he had talked to Defendant and that she was adamant about not going to prison, that Defendant did not want to cooperate with the Government, and that Defendant was unlikely to accept anything short of a probationary period. (T–195). One last time, Mr. Downing asked Mr. Johnson if Defendant had reconsidered her position with regard to cooperating with the Government. (T–196). Mr. Downing testified that he asked Mr. Johnson to ask Defendant again before the start of the trial, and, after seeing Mr. Johnson talk to Defendant, Mr. Johnson indicated that Defendant wanted to go to trial. (T–196).

After the trial commenced, Defendant actively persuaded her brother, Robert Tucker, to cooperate with the Government. Mr. Downing testified that, after Mr. Tucker had

pled guilty, Mr. Tucker was asked what was the problem with Defendant cooperating. (T–197–98). According to Mr. Downing, Mr. Tucker responded that he did not know why Defendant would not cooperate. (T–198).

While Mr. Downing testified that he mentioned the possibility of recommending a seven (7) year sentence during plea discussions to determine if Defendant would change her mind about cooperating with the Government, he indicated that it was not a firm offer. Similarly, Mr. Johnson testified that, "there has never been a discussion between Mr. Downing and myself were a seven-year offer was ever made to Miss McKinnon. The only offer ever extended to me by Mr. Downing with regard to this case was ten years. That offer was communicated to Miss McKinnon. No one ever made a seven-year offer to me in this case with regard to Miss McKinnon's pleading guilty." (T–215).

The Government emphasizes that there was never a "plea offer" made to Defendant regarding a specific sentence that she could receive. (T–192). The Government points out that Mr. Johnson testified that no "seven-year offer" was ever communicated to him by Mr. Downing; however, Mr. Johnson did not specifically deny that any such "discussions" ever took place. (T–29–31; 215). The Government argues that, because no "seven-year offer" was ever made, it is impossible for Mr. Johnson's representation to be ineffective for not communicating a non-existent offer. Furthermore, the Government asserts that even if a "seven-year offer" had been made, Defendant was not prejudiced because she would not have accepted it anyway.

The Court asked Mr. Johnson, assuming a seven-year offer was made, whether Defendant would have accepted. (T–215). Mr. Johnson testified that Defendant would not accept an offer that involved her going to prison. *Id.* Moreover, Mr. Johnson testified that he never resisted any efforts by Defendant to enter a plea in the case. (T–217).

During the evidentiary hearing, Defendant testified that she would have pled guilty if the Government would have made an offer of anything less than ten (10) years. (T–167). Defendant also testified that she did not really pursue the opportunity to plead guilty

because Mr. Johnson told her that she should go to trial and fight the charges. (T–166). Moreover, Defendant testified that Mr. Johnson never fully explained what cooperating with the Government would entail. *Id.*

Defendant testified that she initially informed Mr. Johnson that she did not want to go to prison at all because of her small child. *Id.* Defendant testified that, Mr. Johnson indicated to her that the most severe sentence Defendant might receive would be six (6) months probation. *Id.* Defendant denied that she was adamant about not wanting to go to prison. (T–167).

In order to establish a claim of ineffective assistance of counsel based on the failure to advise a Defendant of a plea offer, the Defendant must demonstrate that she was prejudiced by counsel's inaction. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435 (3rd Cir.1982). Defendant must establish that, but for Mr. Johnson's alleged inaction, she would have accepted the plea offer. *Diaz v. United States,* 930 F.2d 832, 835 (11th Cir. 1991).

The Government argues that Defendant's after-the-fact testimony concerning her desire to accept a plea offer, without more, is insufficient. *See Id.* at 835. The Government emphasizes that Mr. Johnson testified that from his initial representation of Defendant, she maintained that she was not guilty. (T–30; 83). Moreover, Mr. Johnson testified that Defendant did not want to cooperate with the Government. (T–30; 75). Mr. Johnson repeated the same to Mr. Downing on three (3) separate occasions. (T–190; 194; 195). Moreover, Mr. Johnson testified that Defendant was not interested in entering a plea if her sentence would involve jail time. (T–73; 76; 77; 78). Mr. Johnson repeated to Mr. Downing, on several occasions, that Defendant was adamant about not going to jail. ( T–77; 187; 188; 194; 195). Mr. Johnson further testified that Defendant did not want to leave her child by going to prison. (T–77). Mr. Johnson repeated the same concerns to Mr. Downing. (T–190; 194).

Defendant testified that she would have accepted a plea if her sentence would have been less than ten (10) years. (T–167). In addition, Defendant's brother, Robert Tucker, and his attorney, Brian Weakland, testified that about six (6) weeks into the trial, when Robert Tucker discussed a plea, Defendant indicated that she "might be willing" to enter into a joint plea with Robert Tucker. (T–111; 119). However, Mr. Johnson was not present during these discussions. Moreover, Mr. Weakland testified that Defendant had not indicated that she actually wanted to plead guilty. (T–111).

Nevertheless, Detective James McConaughey, who participated in debriefing Robert Tucker after he pled guilty, testified that Robert Tucker was asked why his sister, Defendant, did not want to cooperate, and Mr. Tucker responded that Defendant wanted to go to trial. Detective McConaughey testified that it was not until after the trial was concluded that he received any indication that Defendant had any intention of pleading guilty. (T–140–41). Significantly, Mr. Tucker testified that, prior to trial, Defendant never indicated that she wanted to plead guilty. (T–123). However, Mr. Tucker testified that after he pled guilty, Defendant informed him, that she would be willing to plead guilty to anything less than ten (10) years. (T–124).

Importantly, all plea discussions took place prior to trial, and Mr. Downing testified that Mr. Johnson was told by him that, as far as the Government was concerned, once the jury was selected, the Government was no longer interested in cooperation. (T–196). As a result, the Government contends, any indication that Defendant wanted to enter a plea after the trial had commenced, is inconsequential.

In this Court's Order (Docket No. 417) the Court explained that Defendant would be require to establish that: (1) an actual conflict existed; or (2) Defendant's trial counsel did not communicate the "seven (7) year plea offer" to Defendant and that but for her attorney's errors, she would have accepted the plea offer.

The Court agrees with the Government. Defendant has not established whether there was actually a seven-year offer made, nor whether she would have accepted

it if it had been made and communicated to her. Moreover, Mr. Johnson's letter, upon which Defendant relies, did not mention anything about plea negotiations or offers. Surely, if Mr. Johnson was re-playing the trial in his head and trying to figuring out what could have been done differently, he would have mentioned a plea offer that he failed to communicate. Although Defendant offered self-serving statements that she was willing to cooperate, the overwhelming evidence demonstrates otherwise.

Mr. Johnson's letter to Defendant three and a half years after her trial is no doubt puzzling. Despite the fact that the letter was not prudent, the Court finds Mr. Johnson's explanation that he was frustrated and upset credible. However, Defendant's testimony, was not. Mr. Johnson clearly testified that, at the time of the trial, the advice not to testify was sound. The representations made to the Court during Defendant's Rule 35 hearing were that Mr. Johnson was willing to testify consistently with every statement made in his letter. This certainly was not the case. The Court is convinced that Defendant's Sixth Amendment right to effective assistance of counsel was not violated. Accordingly, it is

**ORDERED** that **Defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (Docket No. 404) be DE-NIED; the Court will schedule a Rule 35 hearing for Defendant; the parties will be expected to brief the Court on all remaining issues concerning Defendant's final sentence at that time.**